UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**CIVIL ACTION NO.: 4:06CV-144-M**

**ROBERT EARL SHOUSE, et al.**                                                                    **PLAINTIFFS**

**v.**

**DAVIESS COUNTY, KENTUCKY, et al.**                                                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court upon a motion by defendants, David Osborne, Victor Stephens, and James Wyatt in their official and individual capacities, and Daviess County, Kentucky (collectively the "Jail Defendants"), for summary judgment [DN 61]. Also before the Court is a motion by the plaintiffs, Robert Earl Shouse and Carolyn Johnson, for oral arguments [DN 70]. These matters are ripe for decision.

### I. SUMMARY JUDGMENT STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard that the Court reviews the following facts.

## II. BACKGROUND

On September 27, 2005, the plaintiffs' decedent, Robert Eugene Shouse, was incarcerated at the Daviess County Detention Center (the "Jail"). (Pls.' Ex. F at 3.) Upon intake, Mr. Shouse responded to questions located on an Inmate Medical Form. (Pls.' Ex. A.) Four questions appear relevant to the Jail Defendants' summary judgment motion. Question seven asked, "Do you have a serious mental health condition that may need attention while you are here?" (Id.) Mr. Shouse responded in the affirmative and noted, "manic depressant w/ psychosis." (Id.) Question two asked, "Are you currently taking any prescription medication?" (Id.) Mr. Shouse answered "No." (Id.) Question nine inquired as to whether Mr. Shouse was "currently thinking about suicide." (Id.) Mr. Shouse responded in the negative to this question. (Id.) Question 18 asked whether Mr. Shouse had "past suicide attempts." (Id.) Mr. Shouse answered "yes" and noted "15 yrs ago (hang)." (Id.) It appears that, although Mr. Shouse had been prescribed Zoloft, Zyprexa, and Strattera to treat his mental health condition in the past (see Burns Dep. 80:7-16), he was not taking these medications upon intake into the Jail (id. 80:15-81:6; Pls.' Ex. A). Based on his answers to these questions, Mr. Shouse was put on moderate suicide watch until he was seen by a mental health professional.

Mr. Shouse was first provided medication to treat his mental illness in early to mid-

November. After taking this prescribed medication, Mr. Shouse started exhibiting abnormal behavior. For example, on November 21, 2005, Mr. Shouse submitted a miscellaneous request form in which he stated, "Sir. I need to get back in population. There are demonds (sic) living in my mat. I'm the only one that can kill them. But after I put the demond (sic) to rest I need some people to get lost. I must start tomorrow." (Pls.' Ex. D at 3.) In response to this request, Officer Victor Stephens, a guard at the jail, placed Mr. Shouse on suicide watch. (Pls.' Ex. F at 3.) Sometime after being placed in his cell on suicide watch, Mr. Shouse began "hitting his head on the window of the cell door." (Id.; see also Stephens Dep. 50:16-20, Aug. 6, 2007.) While hitting his head against the cell door, Mr. Shouse stated "I will get someone to come in this cell and I will get a hold of them" (Stephens Dep. 52:12-15), and also stated "Get the Demons out of my mat . . . " (Id. 52:16-18). Officer Stephens indicated that he believed Mr. Shouse was injuring himself, and in response, Officer Stephens entered the cell (id. 56:13-21), pepper sprayed Mr. Shouse in the face to subdue him (id.), and placed Mr. Shouse in a restraint chair (id. 60:13-18).

Jail personnel contacted a mental health triage line and spoke to Ms. Thompson who recommended that Mr. Shouse remain on high-risk suicide watch. (Id. 65:8-17.) David Osborne, Jailer for Daviess County, testified in his deposition that the Jail is part of the Kentucky Jail Mental Health Triage System.[1] (Osborne Dep. 18:24-19:11, Sept. 20, 2007.) Specifically, Jailer Osborne testified that when Jail personnel must deal with inmates who have mental health issues, "if it seems serious enough where especially you think it's a suicidal issue, that you can report to this mental health triage." (Id. 19:4-6.) Although unclear from the record, Mr. Shouse was apparently taken

---

[1] Green River Regional Mental Health-Mental Retardation Board, Inc. d/b/a River Valley Behavior Health, who apparently responded to the Jail's triage line inquiries, is a party defendant, but did not join the Jail Defendants' motion.

3

off suicide watch sometime after this incident, but was again placed on suicide watch on December 7. On December 7, 2005, Mr. Shouse was placed on high risk suicide watch by Corporal James Wyatt, another guard at the Jail, after contacting Edwina Davis at the mental health triage line. (Pls.' Ex. F at 2-3.) The record indicates that Corporal Wyatt contacted the triage line because of a note that Mr. Shouse wrote which stated "his meds were not correct and he needed to go to isolation." (Id.) An entry made in the Inmate Incident History log indicates that Mr. Shouse's note was attached to the log entry (id.), but that record was apparently lost and Corporal Wyatt does not have any independent recollection of what was contained in the note other than the contents of the log entry. (Wyatt Dep. 49:23-50:8.) Barry Donaldson, a staff member for the triage line, lowered Mr. Shouse's risk management protocol level from high to moderate risk and took Mr. Shouse off suicide watch after Mr. Shouse indicated that he was not going to inflict injury upon himself. (Mingo Dep. 44:18-45:10, June 20, 2007.)

On December 13, 2005, Mr. Shouse notified Deputy Matt Brumley that the medication he was prescribed was "messing with him." (Pls.' Ex. F at 2.) Deputy Brumley complied with Mr. Shouse's request to place him in administrative segregation. (Id.) According to Corporal Wyatt, "[a]dministrative segregation is an area where we place people that generally have trouble adapting." (Wyatt Dep. 53:1-2.) Sometime between December 13 and December 18, Mr. Shouse was caught smoking. (Pls.' Ex. J at 5.) Sergeant Billings presided over a disciplinary hearing on December 18, 2005, where he ordered that Mr. Shouse be placed in isolation for ten days as punishment. (Id.) On December 24, 2005, Mr. Shouse started banging on his isolation cell door demanding that he be let out of the cell. (Pls.' Ex. F at 2.) Although the policy of the jail would normally have permitted an inmate on good behavior to be released from isolation on December 24 after serving two-thirds of

his punishment (id.), Mr. Shouse was ordered to remain in isolation until December 27, the remainder of his punishment, because he was banging on his cell door (id.).

On December 26, 2005, Mr. Shouse was placed on high-risk suicide watch for the final time. When on suicide watch, an inmate is placed in a temporary holding cell observable from the booking area. (Wyatt Dep. 8:3-9:9.) This is a special cell where the inmate is not given bed sheets with which they can hang themselves (Osborne Dep. 26:25-27:3), is not given the type of food which would require eating utensils that can be used to injure themselves or others (id. 26:17-24), and is given a velcro smock rather than a jumpsuit so as to prevent an inmate from using their normal prison garb to hurt themselves (id. 26:12-16). On suicide watch, inmates are also to be monitored every 20 minutes by staff and every five minutes by an inmate watcher. (Id. 27:4-7.) According to the Inmate Incident History log, Mr. Shouse "was not adjusting well to the recently prescribed medication he [was] taking." (Pls.' Ex. F at 1.) Mr. Shouse stated "that the walls [were] moving in on him, and he [was] hearing voices telling him to do 'Things.'" (Id.) Because Mr. Shouse refused to indicate what "things" the voices were telling him to do, he was placed on high risk suicide watch pending a consultation from a member of the triage line. (Id.) James Mingo,[2] a certified outpatient therapist from the triage line, met with Mr. Shouse for 15 minutes at 6:04 a.m. on December 27, 2005. (Mingo Dep. 47:4-10.) Mr. Shouse reported to Mr. Mingo that "he was having more noises and distractions in his head." (Id. 47:18-22.) He also told Mr. Mingo that he was placed on suicide watch because of an anxiety attack and that he denied being suicidal. (Id. 48:8-19, 49:9-14.) As a result of this consultation, Mr. Mingo recommended to the Jail that it should "decrease risk-management protocol . . . ." (Id. 50:9-15.) He also recommended that Mr. Shouse could "return to

---

[2] James Mingo is also a named defendant, but did not join the Jail Defendants' motion.

general population." (Id.) Mr. Mingo testified in his deposition that his understanding of "general population" was that Mr. Shouse would "be taken off high-risk suicide watch and left with other inmates . . . ." (id. 51:22-52:1), and not that he be "taken out of the cell . . . and be put by himself in an isolation cell . . . ." (id. 53:5-9).

Mr. Mingo notified Corporal Wyatt of his recommendation as Corporal Wyatt was in charge and had custody of Mr. Shouse at that particular time. (Wyatt Dep. 15:9-12.) Corporal Wyatt testified in his deposition that he only remembered Mr. Mingo telling him that Mr. Shouse was ready to "go back," but did acknowledge that he read Mr. Mingo's handwritten recommendation that Mr. Shouse could return to "general population." (Id. 12:12-20, 44:15-18.) He testified that he understood the phrase "go back" to mean to go back to "population" and "population" to mean "anyplace other than the booking area." (Id. 12:21-23.) Corporal Wyatt also testified that he could not remember whether he was aware of the incidents that caused Mr. Shouse to be placed on suicide watch on prior occasions or the events that led up to Mr. Shouse being placed on suicide watch for the final time. (See id. 53:12-54:16.) After being taken off high-risk suicide watch, Corporal Wyatt returned Mr. Shouse to the isolation cell he was in before being put on suicide watch. (Id. 13:8-13.) He also brought Mr. Shouse to the property room to provide him with a regular jumpsuit, bed sheet, and eating utensils. (Id. 13:14-22.) Although Jail policy dictated that inmates in isolation, such as Mr. Shouse, be monitored every 60 minutes (id. 16:18-21), it is undisputed that Corporal Wyatt, who was assigned this responsibility, failed to do so (id. 16:24-17:2, 17:7-9). The plaintiffs' penological expert indicates that Mr. Shouse was returned to his isolation cell at 9:24 a.m. on December 27 and that Mr. Shouse was found dead, hanging from an overhead vent, at 11:45 a.m. (Pls.' Ex. M at 4.) He tragically used his bed sheet to commit suicide. (Pls.' Ex. F at 1.)

6

### III.  DISCUSSION

The plaintiffs allege that the Jail Defendants violated Mr. Shouse's constitutional rights and committed various common law torts.  Specifically, the plaintiffs assert that Corporal Wyatt was deliberately indifferent to Mr. Shouse's serious medical needs and that Daviess County is liable because Jailer Osborne created and enforced a policy, custom or practice that was the "moving force" behind Mr. Shouse's suicide, each in contravention of the United States Constitution.[3]  The plaintiffs seek damages for these alleged constitutional violations under 42 U.S.C. § 1983.  The plaintiffs also seek damages for the Jail Defendants' alleged intentional infliction of emotional distress, negligence, and false imprisonment.[4]  Each of these claims will be addressed in turn.

#### A.  FEDERAL CLAIMS

The plaintiffs' federal claims for damages arise under 42 U.S.C. § 1983 which provides in pertinent part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  The plaintiffs assert that the Jail Defendants violated Mr. Shouse's Eighth

---

[3] The plaintiffs' Amended Complaint appears to allege § 1983 claims against Jailer Osborne and Officer Stephens in their individual capacities.  These defendants sought summary judgment on these claims.  However, in response to the Jail Defendants' motion, the plaintiffs did not address the liability of these defendants in their individual capacities.  Because the non-moving party bears the burden of demonstrating a genuine issue of fact for trial after the moving party has demonstrated the lack of a genuine issue of fact, Anderson, 477 U.S. at 247-48, the Court will summarily grant the Jail Defendants' motion as to these claims.

[4] The plaintiffs' Amended Complaint asserts claims for assault and battery.  As the plaintiffs have not responded to the Jail Defendants' motion for summary judgment as to these claims, it appears the plaintiffs have abandoned them.  Therefore, the Court will summarily grant summary judgment in favor of the Jail Defendants as to these claims.

Amendment right to be free from cruel and unusual punishment. (Mem. Opp'n Defs.' Mot. Summ. J. [hereinafter "Pls.' Resp."] at 12.)[5]

### 1. Individual Capacity Claims again Corporal Wyatt

The plaintiffs contend that Corporal Wyatt was deliberately indifferent to Mr. Shouse's serious medical needs because he was subjectively aware of the suicide risk posed by Mr. Shouse, yet he ignored that risk by placing Mr. Shouse in an isolation cell in contravention of Mr. Mingo's recommendation. To establish that a prison official was deliberately indifferent to an inmate's serious medical needs and therefore establish that the prison official violated the inmate's constitutionally protected right, the plaintiffs must satisfy two elements. See Comstock v. McCrary, 273 F.3d 693, 702-03 (6th Cir. 2001). The first element is an objective element, which requires a plaintiff to show that the inmate's medical needs were "sufficiently serious." Id. (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The second element is a subjective element, which requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the

---

[5] It is unclear from the record whether Mr. Shouse was a pretrial detainee or prisoner. (Compare Pls.' Resp. at 2 ("When Mr. Shouse entered the Daviess County Detention Center on September 27, 2005 *after his arrest for an alleged probation violation* . . . .") (emphasis added) and Pls.' Ex. U (agreed order to release Mr. Shouse from the Jail) ("[Mr. Shouse] has not been indicted by the Daviess County Grand Jury . . . .") with Pls.' Resp. 12 ("There are genuine issues of material fact as to whether Corporal Wyatt violated Mr. Shouse's *Eighth Amendment* rights . . . .") (emphasis added).) A pretrial detainee's claim alleging deliberate indifference to the detainee's serious medical needs arises under the Due Process Clause of the Fourteenth Amendment. Ford v. County of Grand Traverse, 535 F.3d 483, 494-95 (6th Cir. 2008) (citations omitted). However, a prisoner's claim alleging the same conduct arises under the Eighth Amendment. See id. Since "[p]retrial detainees . . . are subject to the same deliberate-indifference standard of care[,]" id. at 495 (citation omitted), and the parties agree as to the applicable standard of care, the provision of the Constitution from which Mr. Shouse derived his rights need not be addressed here. See Wheeler v. Knight, No. 1:07CV-P35-R, 2007 WL 2407250, at *3 (W.D. Ky. Aug. 17, 2007).

inference, and that he then disregarded that risk." Id. at 703 (citing Farmer, 511 U.S. at 837). To establish this subjective element of the test, the plaintiffs must show that the prison official's *mens rea* was "higher than negligence but lower than purposeful or knowing infliction of harm." Linden v. Washtenaw County, 167 Fed. Appx. 410, 416 (6th Cir. 2006) (unpublished) (citing Comstock, 273 F.3d at 703). A plaintiff can prove a prison official's *mens rea* in "'the usual ways.'" Comstock, 273 F.3d at 703 (quoting Farmer, 511 U.S. at 842). The "usual ways" include proof by circumstantial evidence from which the trier of fact could conclude that the prison official had the requisite mental state. Id.

### a. Objective Component

There is sufficient evidence in the record from which a jury could conclude that Mr. Shouse's medical needs were sufficiently serious. Psychological needs that result in suicidal tendencies are sufficiently serious so as to establish the objective component of the test. Id. (quoting Horn v. Madison County Fiscal Ct., 22 F.3d 653, 660 (6th Cir. 1994)). Here, the plaintiffs' expert, Dr. Burns, stated that it was her opinion "with reasonable medical certainty that Robert Shouse had a serious medical need in the form of severe psychiatric illness, namely major depression with psychotic features, which placed him at high risk for suicide." (Defs.' Reply Br., Ex. D at 3.)

### b. Subjective Component

To establish the subjective element of the test, the plaintiffs must first show that Corporal Wyatt subjectively perceived facts from which to infer a substantial suicide risk to Mr. Shouse and that Corporal Wyatt actually drew the inference. In the context of prisoner suicides, which are difficult events to predict and prevent, the Court must inquire as to "whether the decedent showed a strong likelihood that he would attempt to take his own life . . . ." Gray v. City of Detroit, 399

F.3d 612, 616 (6th Cir. 2005) (quoting Barber v. City of Salem, 953 F.2d 232, 239-40 (6th Cir. 1992)). When the facts are viewed in the light most favorable to the plaintiffs it appears they have satisfied this burden because there is a genuine issue of material fact as to what Corporal Wyatt knew when he placed Mr. Shouse in isolation. It is undisputed that Corporal Wyatt placed Mr. Shouse on suicide watch after Mr. Shouse complained of issues related to his medication 20 days before Mr. Shouse committed suicide. (Pls.' Ex. F at 3.) Corporal Wyatt indicated that inmates are put on suicide watch when it is believed that the inmate may commit suicide. (Wyatt Dep. 19:3-12.) Corporal Wyatt acknowledged that he may have been aware of the prior incidents where Mr. Shouse was placed on suicide watch. (Id. 51:5-53:22.) This includes the incidents where Mr. Shouse was pepper-sprayed for banging his head against his cell door and where Mr. Shouse claimed there were demons in his mat. Corporal Wyatt also testified that he read Mr. Mingo's handwritten recommendation noting that Mr. Shouse's medication may need to be reassessed. (Id. 44:1-18.) From these facts a jury could find that Corporal Wyatt was aware of facts from which he could infer that Mr. Shouse was a suicide risk and that he also drew the inference.

Corporal Wyatt argues that Mr. Mingo, a mental health expert, took Mr. Shouse off high risk suicide watch and stated that Mr. Shouse "was ready to go back." (Id. 11:4-13.) He also argues that he understood "go back" to mean back to any area of the jail, including isolation, other than suicide watch. (Id. 12:21-23.) Mr. Mingo, however, provides a slightly different version of the events leading up to Mr. Shouse being taken off high risk suicide watch. Rather than telling Corporal Wyatt that Mr. Shouse could "go back," Mr. Mingo testified, and his notes indicate, that he recommended that Mr. Shouse "can return to the general population." (Mingo Dep. 50:16-21.) Mr. Mingo testified that he understood "general population" to mean left with other inmates. (Id. 51:22-

10

52:1.) Although Corporal Wyatt insists that this incident was the result of a mere misunderstanding, a prison official can "not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Farmer, 511 U.S. at 843 n.8. Furthermore, there is sufficient evidence from which a jury could infer that this was not a misunderstanding as suggested by Corporal Wyatt, but that he simply ignored Mr. Mingo's purported instructions. For example, other jail personnel, such as Nurse Sarah Estes, indicated that her understanding of the term "general population" means to be housed with other inmates. (Estes Dep. 45:6-14, Jan. 15, 2008.) Furthermore, the plaintiffs penological expert, E. Eugene Miller, testified that Mr. Mingo defined the term "general population" using the generally accepted definition of that term as used in the corrections community. (Miller Dep. 35:8-37:1, Sept. 22, 2008; see also Pls.' Ex. M at 4 ("In more than forty-three (43) years in this field, I have never before heard a segregation unit referred to as 'general population.'").) Mr. Miller also noted that Daviess County's own policies recognized a difference between segregation and general population. (Pls.' Ex. M at 5.) Although there is other evidence in the record which would support Corporal Wyatt's asserted understanding of the term "general population," there is also sufficient evidence from which a jury could conclude otherwise.

The plaintiffs have also presented sufficient evidence from which a jury could conclude that Corporal Wyatt disregarded Mr. Shouse's substantial suicide risk. If Corporal Wyatt understood Mr. Mingo to recommend that Mr. Shouse be returned to a cell with other inmates and failed to do so, a jury could infer that he was deliberately indifferent to Mr. Shouse's serious medical needs. This conclusion is supported by Linden v. Washtenaw County, 167 Fed. Appx. 410 (6th Cir. 2006) (unpublished). There, a prison official placed a suicidal prisoner in an isolated maximum security

cell after the prisoner reported an impending fight with his cell mate. Id. at 414. While in the maximum security cell, the prisoner committed suicide. Id. The plaintiff filed suit alleging the prison official was deliberately indifferent to the prisoner's serious medical needs. Id. The prison official argued that he could not be deliberately indifferent because a mental health professional had already taken the prisoner off suicide precautions. Id. at 418-19. The Sixth Circuit held, however, that the prison official could still be liable for deliberate indifference, despite the fact that the prisoner was taken off suicide precautions, where there was evidence in the record which suggested the prison official was aware of the prisoner's continued suicidal risk and where the official was aware of an increased risk of suicide if he was placed in an isolated maximum security cell. Id. at 423-24.

Furthermore, if Corporal Wyatt was aware of Mr. Mingo's purported definition of "general population" and yet failed to check on Mr. Shouse every 60 minutes as required by jail policy, a jury could conclude that Corporal Wyatt was deliberately indifferent. In his deposition, Corporal Wyatt explained his failure to abide by Jail policy as follows:

> Q. Yeah, why did you not have him monitored after you put him in cell 181?
> A. He should have been monitored.
> Q. I know that, but why didn't you have him monitored?
> A. I don't know the answer to that question . . . . I didn't forget. I don't know why it wasn't done.
> 
>                                           \*   \*   \*
> 
> Q. Well, do you say anywhere in Exhibit 11 that you instructed anybody to monitor Mr. Shouse after you put him in cell B181?
> A. No, sir, I don't see that written here, no, sir.
> Q. Okay. And you stated that you didn't forget to do that, so my question to you is why then was he not monitored? Did you instruct somebody to do it that didn't do it?
> A. I'm not sure how to answer that.

(Wyatt Dep. 101:4-14, 102:16-25.) Corporal Wyatt argued that he was following Jail policy in

12

returning Mr. Shouse to the cell he came from; however, Corporal Wyatt does not suggest, nor is there any evidence in the record which indicates that Jail policy was to return an inmate to the cell he came from despite the recommendation of a mental health or other medical professional to do otherwise. Furthermore, Corporal Wyatt argues that even if his failure to monitor Mr. Shouse every 60 minutes was the result of deliberate indifference, his actions were not the cause of Mr. Shouse's suicide. The plaintiffs, however, have presented evidence from their experts who opine otherwise. (See Miller Dep. 37:15-39:3, Pls.' Ex. M at 4, 6-7.)

Mr. Shouse's tragic suicide may very well have been the result of a mere innocent or even negligent miscommunication. If so, Corporal Wyatt would not be liable in his individual capacity under § 1983 for deliberate indifference. However, there is also sufficient evidence in the record from which a jury could infer that Corporal Wyatt was aware of Mr. Shouse's substantial suicide risk and chose to ignore that risk. Therefore, summary judgment as to this claim is not appropriate.

### 2. Official Capacity Claims

The plaintiffs also bring § 1983 claims against Daviess County and various prison officials and guards in their official capacities. A § 1983 claim against a local government official in his or her official capacity is actually a claim against the local government itself. Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing Will v. Mich. Dept. of State Police, 491 U.S. 58, 68 (1989)). Therefore, the Court will treat each of these official capacity claims as claims against Daviess County. To determine whether a municipality is liable for a § 1983 violation, the Court must analyze two distinct issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120 (1992) (citation omitted).

Even assuming a jury finds that Corporal Wyatt was deliberately indifferent to Mr. Shouse's serious medical needs in violation of the Eighth or Fourteenth Amendments, under § 1983, a municipality is not vicariously liable for the unconstitutional acts of its agents. Id. at 122. Nor can a municipality be liable if an employee applies an otherwise constitutional custom or policy in an unconstitutional manner. City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989). Instead, a municipality can only be "liable when it can be fairly said that the city itself is the wrongdoer." Id. Only when the injury inflicted is caused by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," will a municipal entity be considered a wrongdoer under § 1983. Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694 (1978).

The plaintiffs allege that the jail had a policy or custom of moving inmates with known suicidal tendencies into isolation. However, even when the facts are viewed in the light most favorable to the plaintiff, there is no evidence of such a policy or custom. Instead, any policy or custom on the part of the Jail appears, at most, to be that inmates being taken off suicide watch are returned to the cell they came from before being put on suicide watch, whether that be in isolation, general population, or administrative segregation. (Osborne Dep. 28:3-13.) The plaintiffs also suggest that the policy or custom of the Jail is to move inmates into isolation after being taken off suicide watch even if the mental health professional indicates otherwise. However, the only evidence of the Jail's policy in this regard is the testimony of Jailer Osborne who indicates that disregarding the instructions of mental health professionals is not the policy of the Jail. In fact, he testified that when an inmate's risk assessment protocol level is changed by a mental health professional, as Mr. Shouse's risk assessment protocol level was changed by Mr. Mingo, the Jail's

14

policy is for the guard to "[f]ollow the medical health professional's instructions." (Id. 21:14-25.) At most, the jury could infer that Corporal Wyatt enforced this policy in an unconstitutional manner by not following Mr. Mingo's instructions. However, to make the County liable for the manner in which Corporal Wyatt enforced this policy or custom would be imposing vicarious liability on the County, which, as discussed above, is not appropriate.

In support of their claim that the Jail's policy was unconstitutional, the plaintiffs cite to Jailer Osborne's testimony where he was asked "why was there not a procedure or policy in place that required jail officers to get the approval of somebody like Mr. Mingo before the inmate was placed in isolation?" (Id. 87:8-11.) This suggestion, however, is the type of after-the-fact second guessing that the Supreme Court has cautioned against. Harris, 489 U.S. at 391-92. Certainly, if the Jail had implemented this suggested policy, events may have unfolded differently. However, there is no evidence that, based on the policy or custom in place at the Jail, an inmate's risk of suicide was "so obvious" that the policy or custom amounted to deliberate indifference. In response to the question, Jailer Osborne testified that "[i]t was just never an issue." (Id. 87:12.) The plaintiffs' experts and other witnesses do not suggest otherwise. The plaintiffs also suggest that the conditions of the isolation cell, which facilitated Mr. Shouse's suicide, is evidence of the County's deliberate indifference. Specifically, they suggest that "Jailer Osborne did not even take the simple and inexpensive step of placing coverings over the dangerous ceiling vents in the isolation cells." (Pls.' Resp. at 23.) They argue that the risk was obvious because "[t]he vent from which Mr. Shouse hung himself had apertures of ½ inch between the individual grates" while "[t]he generally accepted practice in the field call for a security screen to be added to such vents, with openings no greater than 1/8 of an inch." (Pls.' Ex. M at 5.) However, merely because the vents in the isolation cells

15

may have been negligently designed is insufficient to show that their design was the result of a policy or custom on the part of the County or that the County was deliberately indifferent. See Molton v. City of Cleveland, 839 F.2d 240, 246 (6th Cir. 1988).

Ultimately, the plaintiffs have failed to present sufficient evidence from which a jury could conclude that the County had a policy or custom that evidenced its deliberate indifference. Therefore, summary judgment as to this claim is appropriate.

### B. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED" OR "OUTRAGE")

The plaintiffs also assert a state law claim of intentional infliction of emotional distress.[6] They claim that Corporal Wyatt's alleged conduct of placing Mr. Shouse in isolation knowing of his risk for suicide was outrageous and caused Mr. Shouse severe emotional distress. Specifically, the plaintiffs contend that "[s]ince there is sufficient evidence for a jury to find that Corporal Wyatt acted with deliberate indifference to Mr. Shouse's medical needs in violation of the Eighth Amendment, there is certainly sufficient evidence for the tort of outrage." (Pls. Resp. at 27.) However, it is for this reason that the plaintiffs' IIED claim must fail. As this Court recently held in Grace v. Armstrong Coal Co., No. 4:08CV-109-M, 2009 WL 366239 (W.D. Ky. Feb. 13, 2009), "an IIED claim cannot be pled by itself, in tandem with another claim, or in the alternative as long as some other claim with adequate relief [providing for emotional distress damages] fits the facts." Id. at *3 (citing Carter v. Porter, No. 08-246-JBC, 2008 WL 4911142, at *5 (E.D. Ky. Nov. 12, 2008)). The same reasoning applies here. The constitutional tort of deliberate indifference and the tort of negligence are available to the plaintiffs in order to recover for Mr. Shouse's emotional

---

[6] The Jail Defendants argue that the plaintiffs' state law claims over which the Court is exercising supplemental jurisdiction should be remanded. However, remand is not appropriate because at least one federal claim remains.

distress. Accordingly, the plaintiffs' IIED claim must be dismissed. See Martin v. Crall, No. 3:05CV-P399-H, 2007 WL 2083682, at *5 (W.D. Ky. July 18, 2007) (dismissing prisoner's IIED claim when constitutional tort of deliberate indifference and tort of negligence were available to prisoner).

### C. OTHER STATE LAW CLAIMS

The plaintiffs also allege state law claims of negligence and false imprisonment against all of the "Defendants" generically. It appears to the Court, however, that Daviess County and the other Jail Defendants in their official capacities are entitled to sovereign immunity. See Cullinan v. Jefferson County, 418 S.W.2d 407, 408 (Ky. 1967) (citations omitted) (A county "is a political subdivision of the Commonwealth . . ., and as such is an arm of the state government . . . . clothed with the same sovereign immunity."), overruled on other grounds by Yanero v. Davis, 65. S.W.3d 510 (Ky. 2001). It also appears there may be an issue as to whether Jailer Osborne, Corporal Wyatt, and Officer Stephens, in their individual capacities, are entitled to official immunity for their discretionary acts made in good faith, if any. See Yanero, 65 S.W.3d at 522. The parties have not addressed these issues. With respect to the plaintiffs' claim for false imprisonment, the defendants attached a "Parole Violation Warrant" to their reply brief. The plaintiffs, however, have not had a chance to address whether this warrant precludes their claim for false imprisonment. Therefore, summary judgment as to these state law claims is not appropriate at this time. The defendants may choose to file an additional summary judgment motion on these claims if necessary to narrow the issues for trial.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1. The motion by the defendants, David Osborne, Victor Stephens, and James Wyatt in their official and individual capacities and Daviess County, Kentucky, for summary judgment [DN 61] is **GRANTED** in part and **DENIED** in part.

2. The plaintiffs' federal claims against Daviess County, Kentucky, David Osborne, Victor Stephens, and James Wyatt in their official capacities are **DISMISSED** with prejudice. The plaintiffs' federal claims against David Osborne and Victor Stephens in their individual capacities are **DISMISSED** with prejudice. The plaintiffs' federal claim against James Wyatt in his individual capacity is allowed to proceed.

3. The plaintiffs' claims for assault, battery, and intentional infliction of emotional distress are **DISMISSED** with prejudice.

4. The motion by the plaintiffs, Robert Earl Shouse and Carolyn Johnson, for oral arguments [DN 70] is **DENIED**.

5. In addition to the plaintiffs' federal claim against James Wyatt in his individual capacity, there remains state law claims for negligence and false imprisonment against Daviess County, Kentucky and against David Osborne, Victor Stephens, and James Wyatt individually.

cc: Counsel of Record